Law Offices of Douglas T. Tabachnik, P.C.
Woodhull House
63 West Main Street, Suite C
Freehold, NJ 07728
Phone: (732) 780-2760
Fax: (732) 780-2761

*Counsel for Secured Creditor Boiling Springs Savings Bank*

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
NEWARK VICINAGE**

| | |
|---|---|
| In re:<br>**BERGENFIELD SENIOR HOUSING, LLC,**<br>Debtor in possession | **Chapter 11**<br>**Case No. 13-19703 (MS)** |

**OBJECTION OF BOILING SPRINGS SAVINGS BANK TO CONFIRMATION
OF THE DEBTORS SECOND AMENDED PLAN OF LIQUIDATION,
DATED DECEMBER 12, 2013**

Boiling Springs Savings Bank ("BSSB"), by and through its counsel, Law Offices of Douglas T. Tabachnik, P.C., objects to the confirmation of the second amended plan of liquidation proposed by Bergenfield Senior Housing, LLC, debtor in possession (the "Debtor") and filed on December 12, 2013, and respectfully shows to the Court as follows:

**PRELIMINARY STATEMENT**

1.  Boiling Springs Savings Bank objects to the confirmation of this plan as it fails to satisfy the requirements of 11 U.S.C. § 1129(b) in that the treatment of BSSB's claim is unfairly discriminatory and is not fair and equitable. The Debtor's notes to BSSB require payment of interest at six (6%) percent as of May 1, 2013, payment of a prepayment charge, and are in default. The default interest rate is nine (9%) percent. Nevertheless, the plan only provides for the payment of interest at three (3%) percent and no payment of the prepayment charge. The approximate spread between the amounts otherwise due to BSSB and the amounts that the

1

Debtor has supposed to pay involves the swing of over $600,000, to the detriment of the bank. The high bid at the Debtor's auction of the Debtor's real estate was $14.7 million, so BSSB is fully secured as to the entirety of its claim and there is no basis upon which the Debtor can pay junior creditors prior to payment of BSSB in full.

2. The Debtor claims that BSSB waived its right to collect interest in excess of the three percent by reason of an errant computer-generated notice in March 2013. As will be shown more fully in the discussion below, this is an entirely insufficient basis upon which to claim, as the Debtor has, that BSSB has waived fees and interest in excess of proffered three percent.

## JURISDICTION

3. The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4. Venue of this proceeding and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The predicates for the relief sought herein are sections 105(a), 1126 and 1129(b) of title 11 of the United States Code (the "Bankruptcy Code"), Rules, 3018, and 3020 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 3018-2 of the Local Rules of the Bankruptcy Court of the District of New Jersey (the "Local Rules").

## FACTUAL BACKGROUND

5. BSSB is the Debtor's primary secured creditor. The Debtor is indebted to BSSB on account of two promissory notes, as follows:

  a. An Adjustable Rate Note, dated April 9, 2010, in the principal amount of $12,500,000.00, with a remaining principal balance of 12,021,560.54[1] (the "Mortgage Note"), a copy of which is annexed hereto as **Exhibit A**; and

  b. An Adjustable Rate Note, dated April 9, 2010, in the principal amount of $600,000.00, given by Nicholas Rotonda and Rosemarie Rotonda with a remaining principal balance of $574,891.49 (the "Rotonda Note")[2] (both notes are collectively hereinafter referred to as the "Notes"). The Rotonda Note is guaranteed by the Debtor. A copy of the Rotonda Note is annexed hereto as **Exhibit B**.

6.  The Notes are secured by mortgages (the "Mortgages") on the real property and improvements owned by the Debtor, located at 47 Legion Drive, Bergenfield, New Jersey 07621, Block 161, lots 1, 4 and 13 (hereinafter the "Mortgaged Premises"). The Mortgages are properly perfected first and second position mortgages on the Mortgaged Premises, as follows:

  a. A first-position mortgage, dated April 9, 2010, duly recorded on April 19, 2010, at book 410, page 176, secures indebtedness in the total amount of $12,021,560.54 (the "First-Position Mortgage Debt").[3] A copy of the First Position Mortgage is annexed hereto as **Exhibit C**.

  b. A second-position mortgage dated April 9, 2010, duly recorded on April 19, 2010, at book 410, page 205, secures indebtedness in the total amount of

---

[1] All dollar amounts are subject to verification and audit by BSSB, and may be adjusted, as necessary to reflect the amounts due on BSSB's books and records.

[2] The Rotonda Note, although given by the Debtor's principals, is included as it is cross-collateralized by a mortgage on the Mortgaged Premises, and the property described in footnote 3, below.

[3] This mortgage is also cross collateralized by a second position mortgage on commercial property owned by the Rotondas, located at 756 Greely Avenue, Fairview, New Jersey 07022.

    $574,891.49, collateralizing the Rotonda Note (the "Second-Position Mortgage Debt").[4] The First-Position Mortgage Debt and Second-Position Mortgage Debt are hereinafter collectively referred to as the "Boiling Springs Secured Debt"). A Copy is annexed as **Exhibit D**.

  c. The Debtor has unconditionally guaranteed the Second Position Mortgage Debt pursuant to a guarantee executed by the Debtor on April 9, 2010, a copy of which is annexed hereto as **Exhibit E**.

  7. In addition to the foregoing, Nicholas and Rosemarie Rotonda have executed and delivered a personal guarantee of the First-Position Mortgage Debt, dated April 9, 2010.

  8. In addition to the Mortgages, and in further consideration for the First-Position Secured Debt, the Debtor has absolutely assigned to BSSB all income derived from the Mortgaged Premises, including, without limitation, all rents from tenants (collectively referred to as the "Rents") by reason of an ASSIGNMENT OF LEASES AND RENTS, dated April 9, 2010 and recorded on April 19, 2010 (the "Assignment").

  9. This Court on May 8, 2013 issued an order for use of rents in which the Debtor expressly recognized the absolute assignment of same and ownership of rents by BSSB.

  10. The language of both the Mortgage Note and the Rotonda Note are identical in that they contain the following language:

  4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

  (A) Change Dates
  The interest rate I will pay will change to 6.00% on the first day of May, 2013, as per
  the first sentence of Section 4 (D) hereof,. _ - and on that day every 36th month

---

[4] This indebtedness is also cross-collateralized by a first position mortgage on the commercial property owned by the Rotondas, located at 756 Greely Avenue, Fairview, New Jersey 07022.

thereafter. Each date on which my interest rate could change is called a "Change Date".

(D) Limits on Interest Rate Changes
The interest rate will be adjusted after the third year from the date of the loan to 6.00%. The Interest Rate hereunder at the second Change Date will not be greater than 8.00% or less than 4.00%. Thereafter, the Interest Rate will never be increased or decreased on any single Change Date by more than two percentage points (2.00%) from the rate of interest that had been paid for the preceding 36 months nor will the Interest Rate ever be less than 3.00%.

11.     In or about March 16, 2013, BSSB inadvertently sent to the Debtor a computer-generated notice of rate change with respect to the Mortgage Note, which erroneously noted that the rate change as of May 1, 2013 would be zero, instead of the additional 3% provided for in the express language of paragraph 4, quoted above. BSSB was apparently unaware of the error prior to its being called to its attention by the Debtor shortly after the commencement of this case. The Debtor has predicated its entire case of waiver upon this errant correspondence. As will be shown in detail below, this is simply insufficient, as a matter of law, for the Court to draw the legal conclusion that a knowing and intentional waiver has occurred, as the Debtor postulates.

12.     In fact, at the outset of this case and in tandem with the discussion of the Debtor's budget for the cash collateral orders that were then prospective, Debtor's counsel acknowledged on the record before this Court the Debtor's obligation to pay interest at the rate of 6% but indicated that the Debtor would be requesting a freeze on the interest rate for the purpose of facilitating the cash flow necessary to enable the Debtor to administer this Chapter 11 case. As noted below, the math applicable to the Debtor's cash flow would have made it impossible for the Debtor to accomplish this reorganization in the absence of such an accommodation, as its cash flow would have been negative during this case, but for the accommodation offered by the bank.

13.     The respective notes also provide, in pertinent part as follows:

5

> 5(A) In the event of prepayment of this indebtedness prior to maturity, Borrower shall pay to the Lender a prepayment charge as follows:
>
> In the event of prepayment during the first and second years of said indebtedness, 3% of the unpaid principal balance; in the event of prepayment during the third and fourth years of said indebtedness, 2% of the unpaid principal balance; and in the event of prepayment during the fifth year of said indebtedness, such prepayment charge shall be in the amount of 1% of the unpaid principal balance. Thereafter, the loan may be prepaid in full without penalty. Any prepayment as aforesaid must be made upon thirty (30) days written notice to the Note Holder. The Lender will allow a maximum principal reduction of 20% in any one year period without prepayment charge. This reduction shall be non-cumulative and any excess principal payment over 20% shall be assessed this fee.

14.    Accordingly, BSSB is entitled to a prepayment charge, based upon the outstanding balance of the principal of the obligations due to BSSB, any approximate amount of $250,000.

15.    Furthermore, the debtor's obligations are subject to the default provisions of the respective notes which provide, in pertinent part, as follows:

> 7. EVENTS OF DEFAULT
>
> Each of the following shall constitute an event of default ("Event of Default") under this Note:
>
> (A) The failure of the undersigned Borrower to pay in full any installment of interest, principal or other monetary obligation when due under this Note.
>
> . . .
>
> (D) The failure of the Borrower to observe or perform any other term, covenant, agreement, or condition to be observed or performed by the Borrower under this Note or under the Commitment, the Mortgage, or any other Loan Document or agreement executed in connection with this loan.
>
> …
>
> (K) The existence of any financing, mortgage or other liens on or security interest in the Mortgaged Premises, other than liens and security interests in favor of the Lender;
>
> . . .
>
> (O) There occurs any event which, in the Lender's judgment materially adversely affects (i) the ability of the Borrower to perform any of its obligations under the Loan

6

>   Documents; (ii) the business or condition financial or otherwise of the Borrower or of any Obligor; or (iii) the operations or value of the Mortgaged Premises or other collateral posted by the Borrower with the Lender, or the Lender's security therein.
>
>   …
>
>   (S) Any judgment shall be entered against Borrower in excess of Twenty-Five Thousand Dollars ($25,000), that is not (a) within thirty (30) days of entry, discharged, or stayed and bonded, to the satisfaction of Mortgagee or (b) fully covered by insurance and the insurance company has unconditionally accepted liability for that judgment. . .

16.     On or about May 1, 2013, BSSB learned for the first time that a judgment in favor of SM Global against the Debtor on February 5, 2013. Further investigation shortly thereafter revealed, in addition to the foregoing that various members of the Rotonda family had impermissibly placed mortgages on the property as early as December 26, 2010, in the cumulative amounts of $4,200,000.[5]

17.     By reason of the foregoing, the Debtor is in default pursuant to subdivision's D, K, O and S, the Debtor is and was in default on the mortgage obligations since December 26, 2010. In addition, as the bank has reserved its rights with respect to the full rate of interest in the amount of

---

[5] The details concerning the specifics of the five mortgages recorded by the various Rotonda family members are as follows:

1.  Mortgage Deed from Bergenfield Senior Housing LLC to Rosemarie Hebner dated March 1, 2007 and recorded July 26, 2011 in Mortgage Book V793 page 2485, securing $1,000,000.00.

2.  Mortgage Deed from Bergenfield Senior Housing LLC to Gene Rotonda dated March 1, 2007 and recorded July 26, 2011 in Mortgage Book V793 page 2488, securing $1,000,000.00.

3.  Mortgage Deed from Bergenfield Senior Housing LLC to Nicholas C. Rotonda dated March 1, 2007 and recorded July 26, 2011 in Mortgage Book V793 page 2491, securing $1,000,000.00.

4.  Mortgage Deed from Bergenfield Senior Housing LLC to Nicholas S. and Rosemarie Rotonda dated December 26, 2010 and recorded August 2, 2011 in Mortgage Book V799 page 1280, securing $1,500,000.00.

5.  Mortgage Deed from Bergenfield Senior Housing LLC to Nicholas S. and Rosemarie Rotonda dated December 26, 2010 and recorded August 2, 2011 in Mortgage Book V799 page 1284, securing $600,000.00.

The acknowledgement of these mortgages by the Debtor is well documented elsewhere in the record of these proceedings, which are hereby incorporated herein by reference, are not recited in detail, in the interest of judicial economy.

6% during the course of this case, notwithstanding its accommodation to the debtor for the purposes of case administration, the debtor is in default for failure to pay the full amount of the interest reserved under the notes in the amount of 6%. The mortgage notes provide, further, in pertinent part, as follows:

> 8C DEFAULT RATE
> In this Note, the term Default Rate means an annual interest rate which is three percentage points greater than the rate applicable under the terms and conditions of this Note on the earlier to occur of the Maturity Date or the date of the holder's election to declare the entire unpaid balance of this Note to be due and payable, but if such rate exceeds the maximum interest which may be charged under applicable law, then Default Rate shall mean the maximum rate which may be charged under applicable law. If the Note Holder elects to declare the unpaid balance of this Note and all interest under this Note due and payable, interest shall accrue on the unpaid balance of this Note from the date of the Note Holder's election at the Default Rate. After the Maturity Date, interest shall accrue or the unpaid balance of this Note at the Default Rate. To the extent permitted by law, the Default Rate shall survive the entry of any judgment relating to this Note.

18.     By reason of the foregoing, BSSB is entitled to default rate of interest at 9%, relating back to the first default of the Debtor with respect to the mortgages. That is the date on which the first set of unlawful Rotonda family mortgages placed on the debtor's property. Furthermore, the failure of the debtor to pay the proper amounts due by reason of its obligation to pay default interest incurs a late charge equal to 5% of any monthly installment that is not been paid within 15 days after its due date. Paragraph 9 of the respective notes provides as follows:

> 9. LATE CHARGES
> The Borrower shall pay to the holder of this Note a late charge in an amount equal to five percent of the amount of any monthly installment payment (including monthly deposits for tax and insurance premiums escrows due under the Mortgage) which is not paid within fifteen (15) days after it is due.

19.     In addition, paragraph 10 of the respective notes provides that any failure on the part of BSSB to assert that any of its rights, claims, or privileges, shall not constitute a waiver of same, as follows:

8

> 10. NO WAIVER BY NOTE HOLDER
> No delay or failure on the part of the Note Holder to exercise any power or right shall operate as a waiver and such rights and powers shall be continuous. A partial exercise of any power or right by the Note Holder shall not preclude full exercise. No right or remedy of the Note Holder shall be abridged or modified by any course of conduct and no waiver shall be predicated on any course of conduct. The failure of the Note Holder to exercise any power or right shall not subject the Note Holder to any liability.

20. Finally, the respective notes provide for the obligation of the Debtor to pay court costs and attorney's fees in the event of a default. The default on the respective notes was declared on May 1, 2013, as is explained in more detail below. The relevant provision of the respective notes provides as follows:

> 11. COSTS OF COLLECTION
> Upon any Event of Default, there shall be added to the amount due under this Note all costs of collection of this Note incurred by the Note Holder, including court costs and attorneys' fees.

By virtue of paragraph 11, BSSB is entitled to reasonable attorney's fees, presently estimated in the approximate sum of $80,000.00, since the commencement of this case and the period immediately preceding it, related to the costs of collection on the notes.

21. In addition, the Debtor's guarantee of the Rotonda Note expressly provides, in pertinent part, and *inter alia*, as follows:

> The Guarantor waives protest, presentment, demand for payment, notice of default or non-payment, and notice of dishonor to or upon the Guarantor, the Borrower, or any other party liable for any of the Liabilities. The Guarantor acknowledges that this Guarantee and the Guarantor's obligations under this Guarantee are and shall at all times continue to be absolute and unconditional in all respects, and shall at all times be valid and enforceable irrespective of (a) any other agreements or circumstances of any nature whatsoever which might otherwise constitute a defense to this Guarantee and the obligations of the Guarantor under this Guarantee, (b) the obligations of any other person or party (including, without limitation, the Borrower) relating to this Guarantee, or (c) the obligations of the Guarantor under this Guarantee or otherwise with respect to the Liabilities. The obligations of the Guarantor hereunder, and the rights of the Bank in the Collateral, shall not be released, discharged or in any way affected, nor shall the Guarantor have any rights against the Bank by reason of the fact that the Bank fails to preserve any rights in the Collateral or take any action whatsoever in regard to the Collateral or that any of the Collateral may be in default at the time

9

>of acceptance thereof by the Bank or later; nor by reason of the fact that a valid lien on any of the Collateral may not be conveyed to, or created in favor of, the Bank; nor by reason of the fact that any of the Collateral may be subject to equities or defenses or claims in favor of others or may be invalid or defective in any way; nor by reason of the fact that any of the Liabilities may be invalid or unenforceable against the Borrower or any obligor thereon for any reason whatsoever; nor by reason of the fact that the value of the Collateral, if any, or the financial condition of the Borrower, or of any obligee under the guarantee, if any, of the Collateral, may not have been correctly estimated or was thereafter changed; nor by reason of any deterioration, waste, or loss by fire, theft, or otherwise of any of the Collateral; nor by reason of the release, in whole or in part, with or without consideration, of the Collateral or any of it.

Exhibit E.

22. On or about May 1, 2013, BSSB learned for the first time that a judgment in favor of SM Global against the Debtor on February 5, 2013. Accordingly, BSSB sent to the Debtor a notice of default under the terms of the respective mortgage notes, asserting its rights and reserving any of those rights as to which it did not expressly assert within the four corners of the default notice. A copy of the default and acceleration letter is annexed hereto **Exhibit F**. By virtue of the default of the Debtor under the terms of the respective notes, BSSB is entitled to its default rate of interest as provided under paragraph 8C, quoted above, or 9%. In addition, the default letter provides, *inter alia*, and in pertinent part as follows:

> Please be advised that receipt and acceptance of any payments by the Bank with regard to the Loan, now or in the future, shall not constitute any agreement of forbearance by the Bank and shall not constitute a defense in any foreclosure proceeding or any other legal proceedings relating to the Loan. Therefore, we are notifying you that the Bank reserves all of its rights and remedies notwithstanding the acceptance of any payments on account of the accelerated Loan. The Bank neither waives nor releases any claims or defenses in any respect relating to the Loan.
>
> The Bank further reserves all of its rights and remedies and privileges in connection with the foregoing and any action or inaction shall not be considered a waiver.

Exhibit F.

23. In addition, paragraph 10 of the respective notes, as well as the express language of the guarantee made clear and acknowledge by the Debtor that any failure to assert any right or claim under the notes does not constitute a waiver of same.

24. On May 8, 2013, this Court entered the first of four orders authorizing the Debtor to use, with the consent and license of BSSB, the rents derived from the operation of the Debtor's business. In this order and in each of the successive orders, the following language is included:

> Except as otherwise expressly provided in this Stipulation and Order, the terms and conditions of all the Loan Documents shall remain in full force and effect, and the Debtor and Boiling Springs shall retain all of their respective rights and remedies thereunder, subject to the provisions of the Code. This Stipulation and Order is not and shall not be deemed to be, or to constitute, a waiver of any default under the Loan Documents, or a waiver by Boiling Springs of the right to pursue any remedy it deems appropriate in this bankruptcy case, or a waiver by the Debtor of any of its rights, remedies or privileges, all of which are expressly reserved.[6]

25. On August 16, 2013, BSSB filed its proof of claim in this case (claim number four), which contains still another reservation of rights on the Exhibit A that was annexed thereto. A copy of the relevant portions of the Proof of Claim with the Exhibit A disclaimer is annexed hereto as **Exhibit G**.

26. On December 16, 2013, the Debtor conducted an auction of its real property and accepted a winning bid of $14.7 million. This transaction is scheduled to close shortly after the order confirming this plan becomes a final order, but in no event later than February 28, 2014. BSSB estimates its claim at approximately $12.9 million, subject to additional computations for default interest, late fees, and accrued attorney's fees to the date of closing.

---

[6] First Interim Order, dated May 8, 2013, decretal paragraph 19 (docket number 24), Second Interim Order, dated May 21, 2013, decretal paragraph 19 (docket number 38), Third Interim Order, dated July 24, 2013, decretal paragraph 19 (docket number 65), and fourth interim order, dated October 29, 2013, decretal paragraph 19 (docket number 109).

27.     As mentioned above, during the pendency of this case, the Debtor has paid interest at the rate of 3%, pursuant to a request made to BSSB at the commencement of this case, and which BSSB has accepted, as an accommodation only, due to the limited cash flow available to the Debtor from the operation of its business, and in order to facilitate the efforts of the Debtor to administer this reorganization case. The differential in the payments equals approximately $180,000, or a difference of approximately $22,500 per month over a period of eight months during the pendency of this case. Indeed, given the amount of cash indicated in the last operating report as existing in the Debtor's bank account in the approximate amount of $126,000, it is clear that without the accommodation given by BSSB, this debtor could not have remained in chapter 11 without subordinate financing that would have substantially impaired the Debtor's ability to consummate a plan that would have generated a meaningful payout to unsecured creditors, as it would have otherwise been running a deficit during the pendency of this case. Accordingly, and by virtue of the foregoing, BSSB is entitled to late fees as well as default interest and attorney's fees and costs. In effect, the accommodation given by BSSB has amounted to a *sub rosa* financing arrangement of the Debtor's Chapter 11 administration, and with respect to which BSSB should also be entitled to an administrative expense claim. See generally, Collier on Bankruptcy ¶ 503.06[1] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2013).

28.     As if to add insult to injury, and as if to prove the notion that "no good deed ever goes unpunished," the Debtor has repaid BSSB's accommodation by proposing, in its proposed Second Amended Plan of Liquidation, to pay the claim of BSSB by accruing interest at the rate of 3%, rather than the 6% provided for under the respective notes, without any consideration whatsoever for the requirement hat it pay interest at the default rate. As noted above, the predicate for this treatment is the alleged waiver of the 6% interest rate to which the interest rate jumped in May 2013, by virtue of an errant computer generated notice from BSSB to the Debtor

in March 2013. In addition, the plan excludes any payment for prepayment penalties as provided for in the respective notes. In this regard, the Debtor makes no pretense of any reason for the exclusion of the payment of the prepayment charge. (Debtor's Second Amended Plan of Liquidation, class 2, page 11). The Debtor also indicates that BSSB is impaired and entitled to vote on the plan. Id. BSSB has voted to reject the plan.

29.     The failure of the plan to provide for the payment of BSSB's claim, in full, while making provision for payment to unsecured creditors and others whose claims are Junior in priority to those of BSSB, is fatally defective to confirmation for the reasons stated below.

## POINT I

### THE DEBTOR'S SECOND AMENDED PLAN OF LIQUIDATION IS DISCRIMINATORY AS TO, AND FAILS TO TREAT BSSB'S CLAIM IN A FAIR AND EQUITABLE MANNER, AS REQUIRED BY SECTION 1129 OF THE CODE

30.     If a plan does not satisfy the section 1129(a)(8) confirmation requirement because one or more classes of impaired claims or interests has voted to reject the plan, the plan may be confirmed if all other requirements of section 1129(a) are satisfied and all requirements of section 1129(b) are satisfied with respect to the dissenting classes. Under section 1129(b), a plan may be confirmed over the objections of a non-accepting impaired class if the plan (1) does not discriminate unfairly against any such class and (2) is fair and equitable to each such class.[7] However, while the burden of proof under section 1129(a) is by preponderance of the

---

[7] Section 1129(b) provides:

> (b)(1)    Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

This footnote is continued on the next page.

evidence, the burden on a debtor to prove compliance with section 1129(b) is by clear and convincing evidence. <u>In re: Regent Communications, Incorporated, et al.</u>, 2010 Bankr. LEXIS 5793, *8 (Bankr. D. Del. 2010).

31. In the case at bar, the Debtor's treatment of BSSB's claim is both discriminatory and unfair and inequitable, and therefore confirmation must be denied. In the case at bar, the Debtor is proposing to pay BSSB less than the full amount of its claim, the full extent of which is fully secured by the Debtor's collateral, while proposing to pay creditors who are junior in priority. For example, the secured creditors in classes six and seven are proposed to be paid the full amount of their claim. There is no justification for the treatment of other secured claims differently than those of BSSB. Furthermore, since claims junior to BSSB are receiving distribution, the plan, *ipso facto*, violates the absolute priority rule and cannot satisfy the fair and

---

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides—

(i) (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the Debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

11. U.S.C. § 1129(b) (Lexis 2013).

equitable standard. See generally Collier on Bankruptcy ¶ 1129.03[3] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2013)

32.     Furthermore, the Debtor's claim that there is a waiver on the part of BSSB by virtue of any action on BSSB's part must be determined with reference to state law, as it is well settled that the validity of claims is determined with reference to state law. Id. at ¶ 502.03[3](2)(b)(ii).

33.     It is hornbook law, under applicable common-law principles that apply to the circumstances at bar, that, in order for a waiver to be valid it must be unequivocal, with clear evidence of intent and supported by "valuable" consideration. While research has disclosed no case law that is directly on point, the Supreme Court of New Jersey has provided a well stated definition of the concept of waiver and the requirements of same as follows:

> "Waiver" is the **intentional relinquishment** of a known right.  It is a voluntary act, "and implies an election by the party to dispense with something of value, or to forego some advantage which he might at his option have demanded and insisted on." *Geo. F. Malcolm, Inc. v. Burlington City Loan and Trust Co., 115 N.J. Eq. 227* (*Ch.* 1934). It is requisite to waiver of a legal right that there be "a **clear, unequivocal, and decisive act of the party showing such a purpose or acts amounting to an estoppel on his part"**; "A waiver, to be operative, must be supported by an agreement founded on a **valuable consideration**, or the act relied on as a waiver must be such as to estop a party from insisting on performance of the contract or forfeiture of the condition." *Aron v. Rialto Realty Co., 100 N.J. Eq. 513* (*Ch.* 1927), affirmed *102 N.J. Eq. 331* (*E. & A.* 1928).  "Waiver" presupposes a full knowledge of the right and an intentional surrender; **waiver cannot be predicated on consent given under a mistake of fact.**

West Jersey Title and Guaranty Company v. Industrial Trust Company, 27 N.J. 144, 152-53 (1958) (emphasis added).  Clearly, there was neither an intentional waiver of any rights by BSSB, nor can the Debtor point to any "valuable" consideration that might have formed the basis for same as required by the above definition. Another example of the definition came again recently in the context of a mediation matter rule upon by the New Jersey Supreme Court in

which it reiterated the above principles almost *verbatim*. Willingboro Mall, LTD v. 240/242 Franklin Ave., LLC, 215 N.J. 242, 258 (2013) (upholding waiver of mediation communication privilege by reason of express disclosure of same during litigation over the validity of an oral settlement agreement).

34. Moreover, the party alleging waiver has the burden of proving same. Brown v. Royal Battery Corporation, 131 N.J. Eq. 345 (Chancery 1942) ("The defendants allege waiver; therefore, the burden is theirs to establish a knowledge by the complainant of the right waived." "In accordance with the general rule, waiver must be proved by the party alleging it by evidence that does not leave the matter doubtful or uncertain * * *. The burden of proving knowledge on the part of the party charged with the waiver is upon the party relying on it.") (Citing, inter alia, 3 Williston on Contracts 2006 para. 697). Accordingly, the burden is on the Debtor to prove, by clear and convincing evidence that a waiver has in fact occurred here and in this, it has provided no support whatsoever, let alone support that would sustain such a heavy burden of proof.

35. The facts recited above clearly evidence an intention on the part of BSSB not only to not waive any of its rights, but to expressly reserve all of them, repeatedly, in both documentation, correspondence, and the orders entered for the use of rents upon its consent, which attended the circumstances relevant to the case at bar. Moreover, the non-waiver clauses in the respective documents are common in use throughout the lending industry. It does not take much of an imagination to consider the ramifications of a holding that such a trivial and inadvertent notice, such as the one at issue in the case at bar, rendering the commonly used reservations of rights ineffective. The apparent absence of any case law disclosable by diligent research on this issue, it is respectfully submitted, most likely attests to the infrequency with which such clauses are tested. By reason of the foregoing, the Debtor's failure to pay the full

16

value of the claim of BSSB fails to satisfy the requirements of section 1129(b) and the Debtor's plan should not be confirmed.

36. It is respectfully requested that this court dispense with the requirements of local Rule 9013-2 as the matters recited herein present no novel issue of law.

WHEREFORE, it is respectfully requested that this court deny confirmation of the plan unless the Debtor amends the same to provide for full payment of BSSB's claim in accordance with the express provisions of the respective notes and the guarantee, together with such other and further relief as to this court seems just, proper and equitable.

Dated: January 10, 2014

Respectfully submitted,

Law Offices of Douglas T. Tabachnik P.C.
Counsel to Boiling Springs Savings Bank

/s/Douglas T. Tabachnik
Douglas T. Tabachnik
63 West Main St.
Suite C
Freehold, NJ 07728-2141
(732) 780-2760